HARMONY, The (CLAYTON v.). See Case No. 2,871.

HARMONY, The (CONCKLIN v.). See Case No. 3,089.

## Case No. 6,082.

### HARMONY v. MITCHELL.

[1 Blatchf. 549;[1] 8 N. Y. Leg. Obs. 329.]

Circuit Court, S. D. New York. Oct. Term, 1850.[2]

TRADING WITH ENEMY'S COUNTRY — SEIZURE OF GOODS — WHEN JUSTIFIED — TAKING PRIVATE PROPERTY FOR USE OF ARMY — LIABILITY OF OFFICER ORDERING SEIZURE.

1. Where a trader is, during war, engaged in trading with a portion of the enemy's country that has been reduced to subjection, and his trading there is permitted and encouraged by the invading army, his goods cannot be seized on the ground that he is engaged in an unlawful trade with the enemy.

[See note at end of case.]

2. To justify the seizure of property during war, to prevent its falling into the enemy's hands, the danger must be immediate and urgent, not contingent or remote.

[See note at end of case.]

3. A military officer has a right, in a case of extreme necessity and impending danger, for the safety of the government or of the army, to take private property for the public service; and, in such case, the officer is not liable as a trespasser, but the owner must look to the government for indemnity.

[See note at end of case.]

4. But, where property was seized by a military officer, not on account of any impending danger at the time, or for the purpose of being used against an immediate assault of the enemy, by which the seizing army might be endangered, but for the purpose of strengthening the army, and aiding in an expedition against the enemy's force some 200 miles distant, and it was so used, *held*, that the officer was not justified in taking the property, but was a trespasser.

[See note at end of case.]

5. In such case, the liability of the officer for taking and appropriating the property, accrued at the time of the seizure; and if the plaintiff, after the seizure of his goods, does not waive the liability of the officer, or resume ownership over the goods as his private property, he is entitled to recover against the officer in trespass.

[See note at end of case.]

6. In a case where the superior officer who gives the order for the seizure is not justified, neither will the subordinate officer who executes it be justified.

[See note at end of case.]

This was an action of trespass [by Manuel X. Harmony against David D. Mitchell]. The declaration contained three counts, alleging the stoppage and seizing by the de-

fendant, of horses, mules and wagons, with goods, the property of the plaintiff. [Damages $100,000.][3] There was a plea of not guilty, and three special pleas to each count. The first was, that at the time when, &c., the United States were at war with Mexico, and the defendant was lieutenant colonel of a part of the military force employed in the war, under the military command of Col. Doniphan; that the latter, having full and complete authority so to do, commanded the defendant to stop and seize the property, as he had a lawful right to do; and that the defendant merely transmitted the command of Col. Doniphan to his troops, and was not otherwise instrumental, &c. The second special plea was, that at the time when, &c., the United States were at war, and the defendant was lieutenant colonel of a military force of the United States, employed in the war, under the military command of Col. Doniphan; that the plaintiff, being a citizen and resident of the United States, after the war existed, knowing its existence, drove the horses and mules from the territories and jurisdiction of the United States, into the territories and jurisdiction of Mexico, with the design to trade and carry on a friendly commercial intercourse with the citizens of Mexico, and to afford aid to the same in the war; that Col. Doniphan, having full and complete authority so to do, commanded the defendant to stop, seize, &c., as he had a lawful right to do, for that cause; and that the stopping, &c., necessarily occurred in the execution of the command, for that cause, &c. The third special plea was the same as the last, except that it omitted all about Col. Doniphan, and averred the seizure to have been by the defendant, in performance of his duty as lieutenant colonel, and as he had a lawful right to do for that cause, &c. To the special pleas to the first and third counts there were general replications of de injuria sua propria. But to the special pleas to the second count there were special replications. To the first special plea the plaintiff replied, admitting the war, the office and employment of the defendant, the superiority of Col. Doniphan, and that the defendant was bound to obey his lawful commands, and averring that the property was found by the defendant, and known by Col. Donipian, to be owned and used by the plaintiff as his private property; that the plaintiff was a citizen of the United States, and was, with his property, in the peace and under the protection of the United States, of which Col. Doniphan and the defendant had notice; that Col. Doniphan did not command the property to be seized, nor was the same in fact seized by the defendant, for the purpose or in contemplation of any proceeding in due course of law for any alleged forfeiture thereof, but to ap-

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

[2] [Affirmed in 13 How. (54 U. S.) 115.]

[3] [From 8 N. Y. Leg. Obs. 329.]

ply the same to the use of the United States, without compensation to the plaintiff, of which the defendant had notice; and that the property was stopped and seized of the defendant's own wrong, and without the cause in the plea alleged; and traversing the allegations that Col. Doniphan commanded the defendant and had lawful right so to do, and that the stopping, &c., occurred in the execution of such command. To the second special plea the plaintiff replied, admitting the war, the office and employment of the defendant, the office of Col. Doniphan, and that the defendant was bound to obey his lawful commands, and that the plaintiff was a citizen and resident of the United States, and averring that the property was found and known by the defendant and by Col. Doniphan to be owned and used by the plaintiff as his private property; that the plaintiff, so being a citizen, was, with his property, in the peace and under the protection of the United States, of which the defendant and Col. Doniphan had notice, and did not take the property from the territories or jurisdiction of the United States into the territories and jurisdiction of Mexico, except to and in such places as had been and were captured and subdued, and at the time held in subjection by the forces of the United States, and while such places were so held under subjection to such forces and to the United States, nor except by the license and permission of the commanding officers of such forces, duly authorized to grant the same, nor with the design to trade or carry on a friendly intercourse with the citizens of the republic of Mexico, except only with such of them as had then become and were in subjection to the forces of the United States at such places, and by the license and permission of the commanding officers of such forces at such places, duly authorized to grant the same, and not to afford aid to the republic of Mexico or its citizens in the said war, of all which the defendant and Col. Doniphan had notice; that Col. Doniphan did not command the defendant to stop, seize, &c., nor was the property stopped, seized, &c., by the defendant, by reason of the supposed driving from the territories or jurisdiction of the United States into the territories or jurisdiction of Mexico with the unlawful design alleged, nor for or in contemplation of any proceeding for a forfeiture thereof, but to apply the same to the use of the United States, without compensation to the plaintiff; and that the property was stopped, seized, &c., by the defendant, of his own wrong, and without the cause alleged; and traversing the rest of the plea, as before. To the third special plea the replication was substantially the same as the last, mutatis mutandis. Issue having been taken [by rejoinders and similiters] [4] the cause was tried before Mr.

Justice NELSON. In the course of the trial, some discussion occurred as to the forms of pleadings. Mr. Justice NELSON intimated his opinion, that the first special plea was bad, and the others perhaps defective, for not alleging a forfeiture. But he admitted all the evidence offered, subject to the objections taken.

The case on the part of the plaintiff was this: An inland trade between the citizens of the United States and the interior northern parts of Mexico, had, from small beginnings, become quite large and important, before the late Mexican War. At first, it was carried on irregularly, in small expeditions from the state of Missouri, chiefly from St. Louis, connected with hunting parties or the fur trade. The merchants of the Atlantic cities soon found it worthy of attention, and larger expeditions were set on foot. The United States government favored the trade, so far as to allow a drawback of duties on exportations in that direction. The Mexican government allowed their military governors to exact duties, which entitled the goods to go to any part of Mexico. The customary exaction at Sante Fé was $500 a wagon load— a specific duty, without much reference to contents or value, which favored the use of large wagons, closely packed with costly goods. The plaintiff was a native of old Spain, but a naturalized citizen of the United States domiciled and residing in New-York. He retired from the firm of P. Harmony's Nephews & Co., for the purpose of entering into this trade. When Texas was annexed, in March, 1845, diplomatic intercourse was suspended between Mexico and the United States, and by many hostilities were expected. Gen. Taylor had been sent down to Corpus Christi, on the coast of Texas, and a squadron from the United States navy was sent along the coast of Vera Cruz. In October, 1845, the Mexican government consented to open negotiations, and requested a withdrawal of the squadron, which was acceded to, and Mr. Slidell was sent as a minister to Mexico. In December, 1845, the president, in his message, stated the situation of affairs, and expressed his hopes of an amicable adjustment. Apprehensions of hostilities, which had checked the trade, having blown over, the plaintiff, in December, 1845, entered into active preparations for a large expedition, to start early in the spring of 1846 from Independence, at the head of navigation on the Missouri river. He selected and purchased his goods at New-York and Philadelphia, some of them imported, and had them arranged and packed expressly for the business. They were sent overland from New-York and Philadelphia to Pittsburg, where large covered wagons were made for them. The wagons and goods were sent to St. Louis, and thence to Independence, the general starting place, were oxen, teamsters, &c., had to be procured. The plaintiff arrived there in April, and was there about a month, engaged

---

[4] [From 8 N. Y. Leg. Obs. 329.]

in preparing and arranging his expedition. Hostilities with Mexico broke out, quite unexpectedly to all at that time, while the plaintiff was at Independence. The existence of war was recognized by congress, and proclaimed by the president at Washington on the 13th of May, 1846. Before the plaintiff heard of this, and about the 26th of May, he started on his expedition, with a train consisting of fourteen large wagons drawn by twelve oxen each, two travelling cariages drawn by mules, and twenty-six men; the goods costing about $40,000, the wagons and outfit about $10,000, and the expenses of transportation being generally computed at a sum equal to the first cost. There was a garrison of United States dragoons within a few hours ride of Independence. The officers knew of his preparations and intention to go. One of them passed him just after he had started, and knew nothing of any war, and no interruption of the trade appeared to have been apprehended. About ten days afterwards, while the plaintiff was going at the rate of fifteen or twenty miles a day, and when he was fairly out on the prairies, he was overtaken by another officer with dragoons, who notified him of the war, and ordered him to follow on in his rear. Following him, the plaintiff had to take a longer route than usual to arrive at Bent's Fort, situate on the old boundary line between the United States and Mexico, distant five or six hundred miles from Independence, and three or four hundred from Santa Fé. These distances were over a wilderness, without roads or houses, without inhabitants except the wildest tribes of Indians, and without provisions except such as were secured by the rifle. The oxen and mules had to be pastured; the men were all armed, and, securing themselves at night under the wagons, had to defend their property from the Indians, and procure food for themselves. The plaintiff was delayed about a month to allow the mounted troops under Gen. Kearney to precede him, he having permission to follow in their rear. There was some show of resistance by the Mexicans near Santa Fé, but none was really made. The wagon trains of the plaintiff and other traders entered Santa Fé about the 25th of August. New-Mexico was found under subjection to Gen. Kearney, who acted and was recognized as governor. He gave the plaintiff permission to trade in New-Mexico, charging $4 a wagon for a license. It appeared by his instructions, and by those sent to the other generals and commodores, that they were directed to favor the trade with Mexico, as far as practicable consistently with hostile operations. The trade in New-Mexico was small, and the market filled. The plaintiff sold his oxen, and remained until December, when, everything being quiet in that region, Gen. Kearney sent Col. Doniphan, with his regiment of mounted volunteers, down the Rio Grande, to open a communication with and join Gen. Wool,

who was supposed to have crossed the Rio Grande from Texas, several hundred miles below, on his way to Chihuahua. Gen. Kearney left another regiment, with some artillery, at Santa Fé, under Col. Price, and proceeded himself with dragoons overland to California. The plaintiff borrowed money, and purchased mules for his wagons at high prices, using ten mules to each wagon; and he, with the other traders, was permitted to join and follow Col. Doniphan southerly down the Rio Grande, along the present boundary between Mexico and the United States, some three hundred miles, to El Paso del Norte, where the Mexicans had a fortification, called San Eleasario. The defendant, Lieut. Col. Mitchell, belonging to Col. Price's regiment, was separately authorized by the latter to open communications with Gen. Taylor, with one hundred mounted men as an escort. As he was going the same road, he joined Col. Doniphan, upon the understanding that he was at liberty to leave him and proceed alone if he chose. Col. Doniphan, just before reaching El Paso, was attacked by surprise at Brazito on Christmas Day, by a considerable Mexican force, which he defeated and pursued, entering El Paso a day or two afterwards. The Mexican troops which escaped retired to the city of Chihuahua, about 280 miles southwest from El Paso, towards the interior of Mexico, and proceeded to fortify themselves at Sacramento, near that place. Col. Doniphan and Lieut. Col. Mitchell, finding at El Paso that Gen. Wool was not at Chihuahua, nor any where within reach of communication (he having in fact gone south to join Gen. Taylor), sent back to Col. Price at Santa Fe for a reinforcement of artillery. The artillery arrived about the 1st of February, under Major Clark, and rested a few days, and then preparations were made for advancing from El Paso to Chihuahua, near which place it was known the Mexicans would be encountered in a much superior force. The plaintiff had been able to make some sales at El Paso. There were about 315 large traders' wagons there, including his. His acquaintance with the Spanish language gave him advantages over others. He was an interpreter for both sides—the Mexican inhabitants, and the American officers. While at El Paso, the funds provided by the government for the United States' troops failed. They procured necessaries through the traders, who, on selling their goods to Mexicans, money being scarce, would take provisions in payment, turn them over at the same prices to the quartermasters, and receive drafts on the United States' disbursing officers in payment. The plaintiff supplied Lieut. Col. Mitchell's quartermaster in this way. His trading with the Mexicans was known and encouraged. The road between El Paso and Chihuahua was over a mountainous desert, excessively bad and rough, and the worst difficulties of all were the long distances which had to be travelled without water, and

often without pasture for the cattle. One of these was of sixty miles, which the heavy wagons could not cross without being three days without water. Traders knew how to ease and manage their cattle, but, when required to march with an army, their ease and convenience would be but little attended to. Either the Mexicans or the Americans first marching over this road to attack the other, would expose themselves considerably, especially to cavalry and to sudden attacks. The plan was discussed and contrived by the defendant and other American officers, of making use of all the traders' wagons, as a protection and defence during the march and attack. Behind and between the wagons the army could march and fight with comparatively little exposure. "Corrals," as they were termed, could be formed, by arranging the wagons in a circle, chaining them together, and forming a kind of fieldwork, behind which all would be safe, and against which cavalry could do nothing. The three hundred teamsters, armed with rifles, formed no mean force of themselves. This was a favorite plan of the defendant, and he urged it strenuously. Nearly all the other traders agreed to come into it. But the plaintiff and two other large traders were opposed to it, deeming the risk too great, and apprehensive that the Mexicans would become hostile to them, and deter them from trading, if they thus made themselves a part of the attacking force. The United States' officers had reports of an insurrection at Santa Fé in their rear, and were in ignorance of the situation of Gen. Wool and Gen. Taylor at the south, having rumors through the Mexicans, that Gen. Taylor was killed and his army taken; but they resolved to proceed rather than remain inactive or retire.

There was some controversy upon the trial as to the orders given by Col. Doniphan. He directed how the wagons proceeding with the army were to march, and directed the teamsters to be organized into companies and battalions, as if mustered into service, they to elect their officers, who were to be recognized as such. It was admitted that his orders were to be communicated by the defendant to the plaintiff; but it was urged that while he gave some discretionary orders to the defendant, he contemplated the exercise of no force by him to compel the plaintiff to proceed. The defendant, however, with a detachment of men, compelled the plaintiff's men, wagons and mules to proceed and march with the rest. The plaintiff protested, both to him and Col. Doniphan, against the act, and this was the seizure and trespass complained of. The plaintiff, some ten days before, had asked leave to proceed to Chihuahua with his wagons without the troops, but had been refused. Some suggestions were made, that by so doing, and then by declining to proceed with the rest, and pretending his mules had been run away with, he evinced a desire to join the Mexi-

cans. Lieut. Col. Mitchell afterwards gave a certificate, stating that the reasons why the traders were compelled to accompany the army were: "1st. We wished to make use of the wagons and bales of goods to form a field-work, in the event of our being attacked by an overwhelming force in the field; 2d. We wished to avail ourselves of the services of the American teamsters, whom we had armed and organized as an infantry battalion, numbering nearly three hundred men; 3d. We wished to prevent this large amount of property from falling into the hands of the enemy, because it would have aided him in paying and equipping his troops." The army turned off westerly from the Rio Grande, about the 13th of February, and encountered the Mexicans at Sacramento on the 28th. The animals of the plaintiff were very much worn and injured by the march, and some of them lost. On the last day's march, about twenty miles, the wagons proceeded, four columns abreast, over rough ground, with the troops marching between them. The Mexican intrenchments were upon an eminence on one side of the road, where it passed between the hills. After a reconnoissance the wagon train and artillery crossed a gulley, made a circuit and galloped up an opposite eminence in front of the Mexicans and formed a corral. The Mexican cavalry sent to oppose this manoeuvre were completely checked and driven back. The United States artillery followed up the advantage, and, a charge upon the intrenchments being immediately made, they were all soon carried, and the whole Mexican force put to rout. The only man killed on the American side was a trader, who had been elected major of the battalion of teamsters. The Mexicans attributed their defeat principally to the "galloping fort," as they termed the wagon train. All the American officers admitted that the wagons had been serviceable. The battle being over, Cols. Doniphan and Mitchell hastened to take possession of Chihuahua. The plaintiff's wagons, men and mules were left to take care of themselves. Some of the mules were taken by the artillerymen and soldiers, and others lost. The wagons were at length taken to the plaza at Chihuahua, and the goods stored with the Spanish consul. Col. Doniphan advised the plaintiff to sell what he could, and he attempted to do so, but the wealthy inhabitants had retired, and he sold but little. Col. Doniphan, after a month or two, being about to retire from Chihuahua with his troops, the plaintiff gave him an order for his goods, leaving them in the hands of the Spanish consul. The Mexican authorities returned to Chihuahua at once, and seized the goods and sold them. They had caused the plaintiff to be published as a man amenable to their vengeance. He dared not remain there, but retired with the army. One trader was killed by the mob. Some others remained in safety.

The defendant contended, that the plaintiff had no right to trade with the enemy; that his property was liable to arrest on that ground; that Col. Doniphan had a right to prescribe in what order the plaintiff's wagons should proceed and march; that the property was liable to fall into the enemy's hands, and it would have been madness to leave it at El Paso; that the emergency was such as justified the taking it, to save the lives of all concerned; that Col. Doniphan had taken it as a public officer, not for himself, but for the government, and the plaintiff's only remedy was by application to congress; that the defendant was a subordinate officer; that he only obeyed the order of Col. Doniphan; that, right or wrong, he was bound to obey it, and it was a lawful order; that the plaintiff had resumed the ownership of his property; and that the abandonment of the goods to Col. Doniphan deprived him of all right of action against the defendant, and occasioned the seizure of the property. The depositions of Col. Doniphan, Major Clark, and others, were read, giving their views of the propriety of the course pursued. The proceedings had in congress on the plaintiff's petition, and the report of the secretary of war on the subject, were read. In this report, the secretary of war (Mr. Marcy) had said: "With regard to the act of Col. Doniphan in taking possession of the train, it appears to have been justifiable under the circumstances, if it was necessary to prevent the train from falling into the hands of the enemy—a result of which Mr. Harmony appears to have been desirous, as he was furnished with Spanish passports. And the same may be remarked of the subsequent forced marches whereby his teams were injured." It appeared that the plaintiff was furnished with a passport given by the Spanish consul in New-York on the 4th of April, 1846, certifying that the plaintiff was a native of Spain, and was travelling to Mexico as a merchant; and that it was a common thing to take such passports irrespective of any war. The chief Mexicans, being of Spanish blood and descent, looked upon natives of old Spain with more favor than upon natives of Missouri or Texas.

After the testimony was closed, the counsel, on the suggestion of the court, discussed the principles of law bearing upon the case.

Francis B. Cutting and Charles B. Moore, for plaintiff, cited and commented upon the cases of Del Col v. Arnold, 3 Dall. [3 U. S.] 333; Murray v. The Charming Betsey, 2 Cranch [6 U. S.] 64; Maley v. Shattuck, 3 Cranch [7 U. S.] 458; The Julia, 8 Cranch [12 U. S.] 181; The Anna Maria, 2 Wheat. [15 U. S.] 327; Gelston v. Hoyt, 3 Wheat. [16 U. S.] 246, 274, 327; U. S. v. Rice, 4 Wheat. [17 U. S.] 246; U. S. v. Eliason, 16 Pet. [41 U. S.] 291; McKenna v. Fisk, 1 How. [42 U. S.] 241; Fleming v. Page, 9 How. [50 U. S.] 603; Mayor, etc., of New York v. Lord, 17 Wend. 285; Wilson v. Mackenzie, 7 Hill, 95; Sutton v. Johnstone, 1 Term R. 493.

J. Prescott Hall, Dist. Atty., and Lorenzo B. Shepard, for defendant, referred to O'Brien, Military Law, pp. 337, 344; Gelston v. Hoyt, 3 Wheat. [16 U. S.] 246; Martin v. Mott, 12 Wheat. [25 U. S.] 29, 32, 33; The Marianna Flora, 11 Wheat. [24 U. S.] 1; The Rapid [Case No. 11,576]; Wilkes v. Dinsman, 7 How. [48 U. S.] 130, 131; Griswold v. Waddington, 16 Johns. 438.

[Hon. W. L. Marcy, who, as secretary of war, had written the report above mentioned, attended the trial, and, having advised with and assisted plaintiff's counsel, he, at their request, stated his views respecting the cases in which a military officer might destroy property to prevent its falling into the hands of the enemy, or, in an emergency, take it and apply it to the use of the government. He argued that unless the officer agreed with the owner, being a citizen or neutral, to pay what the latter demanded for his property, or obtained the consent of the owner to take it, he made himself personally responsible for what he took for the use of his command, even under the most pressing emergencies. That if a garrison wanted provisions, they could not be permitted to go into a store and take them, and then to justify the act by saying they would otherwise starve. That there was no immediate danger to the property of plaintiff where it was taken; that there must be an existing and pressing danger to justify the taking of it; that the taking it because the officer wished to advance into the enemy's country 200 miles, instead of remaining where he was, could not be justified by the plea of necessity. That in all such cases the officer subjected himself to an action by the owner, although his superiors might have no inclination to censure his course.] [5]

NELSON, Circuit Justice. One ground on which the defence is placed is, that the plaintiff was engaged in an unlawful trade with the public enemy, and therefore his goods were liable to confiscation; and that any person, particularly an officer of the army, could seize the same. The principle of law is admitted; but, as I understand the evidence, this ground of defence has altogether failed. The defendant was not only not so engaged, but was engaged in trading with that portion of the territory which was reduced to subjection by our arms, and where his trading with the inhabitants was permitted and encouraged. The army was directed to hold out encouragement to traders, for the purpose of conciliating the inhabitants, and did so.

Another ground taken by the defendant and relied upon in the defence, stands upon

[5] [From 8 N. Y. Leg. Obs. 329.]

another principle of public law, namely. the taking possession of the goods of the plaintiff at a time when it was necessary for the purpose of preventing them from falling into the hands of the enemy. This has been urged as particularly applicable to his goods, some portions of which consisted of arms and munitions of war, wagons for transportation, &c. Taking the whole of the evidence together. and giving full effect to every part of it, we think this branch of the defence has also failed. No case of peril or danger has been proved, either as it respected the state of the country, or the force of the public enemy, which would lay a foundation for taking possession of the goods of the plaintiff at San Eleasario, the place at which they were seized. On the contrary, the country was in possession of the arms of this government; and there was no enemy or hostile public force at the time in the neighborhood, which put the goods in the danger of being captured. The · plaintiff's goods, therefore, stood in the same condition as the goods of any other trader who had been permitted to trade in the country. The evidence fails to make out a case of seizure of property on account of the urgent danger of its falling into the hands of the enemy. The danger must be immediate and urgent, not contingent or remote; otherwise every man's property, particularly on the frontiers, would be liable to be seized or destroyed, as it always will be more or less exposed to capture by the public enemy. There was no immediate or impending peril in the case, as there was no enemy in the neighborhood or advancing to put the goods in danger. They were more exposed to marauding parties than to any public force; and those the· plaintiff considered himself able to take care of.

The next ground of defence, which constitutes the principal question in the case, and upon which it must probably ultimately turn, is the taking of the goods by the commanding officer, for public use. I admit this principle of public law. But this, too, rests upon the law of necessity. I have no doubt of the right of a military officer, in a case of extreme necessity, for the safety of the government or of the army, to take private property for the public service. The officer in command of an army upon its march, if it were in danger from the public enemy, would have a right to seize the property of the citizen, and use it to fortify himself against assault while the danger existed and was impending, and, in ordering the seizure, would not · be liable as a trespasser. The owner must look to the government for indemnity. The safety of the country is paramount, and the rights of the individual must yield. in a case of extreme necessity. No doubt, if the enemy had been in force in the neighborhood of the United States troops at San Eleasario, with the disparity which existed at Sacramento, and if the same danger had existed there that threatened them at the latter

point, the commanding officer might, for the safety of his army, have seized the wagons and teams of the plaintiff, and have appropriated them to the public service while the danger lasted. An immediate and urgent necessity would have justified the seizure for the safety of the army. Looking, however, at the testimony, it seems to me quite clear, that these goods were seized, not on account of any impending danger at the time, or for the purpose of being used against an immediate assault of the enemy by which the command might be endangered; but that they were seized and taken into the public service, for the purpose of co-operating with the army in their expedition into the enemy's country. The mules, wagons and goods were taken into the public service, for the purpose of strengthening the army, and aiding in the accomplishment of the ulterior object of the expedition, which was the taking of Chihuahua. It was not to repel a threatened assault, or to protect the army from an impending peril. In my judgment, all the evidence taken together does not make out any immediate peril, or urgent necessity, existing at the time of seizure, which would justify the officer in seizing private property, and impressing it into the public service. The evidence does not bring the case within the principle of law. There is not only no evidence of an. impending peril to be met and overcome by the public force, but the goods were taken for a different purpose. The army had to march over two hundred miles before it reached or found the enemy. The danger, if any, lay in the pursuit; not in remaining at San Eleasario, or returning to Santa Fé. There had, indeed, been a sudden insurrection against the authority of the government at Santa Fé; but it was immediately suppressed.

As to the remaining grounds of defence— the re-delivery of the property, and its acceptance by the plaintiff—the liability of the defendant for taking the goods, and appropriating them to the public service, accrued at the time of the seizure. If it was an unlawful taking, the liability immediately attached; and the question is, whether that liability was discharged or released by any subsequent act of the plaintiff. Col. Mitchell, who executed the order, was not alone responsible. Col. Doniphan. who gave the order, was also liable. They were jointly and severally responsible. Was any act, then, done by the plaintiff, which waived the liability, or by which he resumed the ownership and possession of the goods? Certainly, the abandonment of the goods to Col. Doniphan at Chihuahua cannot be regarded as an act of resumption of ownership; on the contrary, it was consistent with the assertion of. his liability. There had been a negotiation between them; Col. Doniphan advised him to· sell the goods at Chihuahua, and look to the government for indemnity; and. in pursuance of this, measures were taken for their pro-

tection and safe keeping. I doubt if there be any evidence showing an intent on the part of the plaintiff to resume ownership over the goods as his private property, after they had been seized by the army, or any act done by him that would, when properly viewed, lead to that result.

After the expression of these views by the court, the counsel on both sides declined going to the jury, and, under the law as laid down, the jury rendered a verdict upon the facts for the plaintiff, for $90,806.44.

[NOTE. The defendant then sued out a writ of error from the supreme court, where the judgment was affirmed in an opinion by Mr. Chief Justice Taney, who said that the trading, having been sanctioned by the executive branch of the government, and also by the commanding military officer, could not be considered as commerce with the enemy. Private property may be seized to prevent it from falling into the hands of the enemy or for use of army in some immediate danger such as will not admit of delay. Private property, however, cannot be seized for the purpose of insuring the success of a distant expedition upon which the army is about to march. An officer making a seizure cannot justify his trespass by showing the orders of his superior officer, as an order to commit a trespass can afford no justification to the person committing it. Whether the owner resumed possession of goods after seizure is a question for the jury, and in the present case they were justified in finding that he did not. 13 How. (54 U. S.) 115.]

HARMONY SETTLEMENT (NACHTRIEB v.). See Case No. 10,003.

HARMONY SOCIETY (LEMIX v.). See Case No. 8,239.

HARNDEN (FISHER v.). See Case No. 4,-819.

HARNDEN (ROBERTS v.). See Case No. 11,903.